## BRIGGS MFG. CO. v. UNITED STATES.

District Court, D. Connecticut. February 15, 1929.

No. 3174.

1917, and before the termination of the state of war with Germany, the plaintiff constructed or acquired various items of machinery, buildings, and other equipment, upon which it claims the right to a deduction from its income for the year 1918 under the provisions of section 234 (a) (8) of the Revenue Act of 1918 (40 Stat. 1078). There are some 21 items involved, and at trial evidence was introduced as to their character, cost, and date of acquisition.

The following is a schedule of the items for which the plaintiff claims amortization, and the claimed date of acquisition or commitment, together with the claimed original cost:

| Item No. | Description. | Date of Acquisition. | Original Cost. |
|---|---|---|---|
| 1 | Winder | May 18, 1917 | $ 420.00 |
| 2 | Warp compressor | March 14, 1918 | 1,733.70 |
| 3 | Welding outfit | September 30, 1917 | 171.51 |
| 4 | Generator | October 1, 1917 | 683.31 |
| 5 | Pumps | March 8, 1918 | 364.00 |
| 6 | Comber condenser | September 3, 1918 | 1,602.91 |
| 7 | Automatic sprinkler | June 25 and 30, 1917 | 527.00 |
| 8 | Steam heating system | July 7, 1917 | 325.00 |
| 9 | Picker room addition | July 31, 1917 | 8,875.59 |
| 10 | Tenement houses | March 4, 1918 | 800.00 |
| 11 | Garage for fire engine | Middle of September, 1918 | 2,000.00 |
| 12 | | April 30, 1917 | 148.27 |
| 13 | Shafting and hangers | May 5, 1917 | 64.96 |
| 14 | Trolley track | November 26, 1917 | 2,754.00 |
| 15 | Improved windows | | |
| 16 | Wiring to install electric lights | November 14, 1917 December 28, 1918 | 1,197.54 1,000.00 |
| 17 | Ice house | | |
| 18 | Improvements on dam of main reservoir | April 30, 1918 | 429.27 |
| 19 | Improvements on No. 3 dam, new telephone lines | September 1, 1918 | 3,803.30 |
| 20 | Furnace for head weaver's house | September 30, 1918 | 1,463.00 |
| 21 | New roof for boiler house | September 27, 1918 | 2,387.00 |
| | New water tank for mill No. 4 | November 3, 1918 | 1,558.15 |

Richard W. Hale, Daniel L. Brown, and David Burstein, all of Boston, Mass., for plaintiff.

Henry A. Cox, of Washington, D. C., and George H. Cohen, Asst. U. S. Atty., of Hartford, Conn., for the United States.

THOMAS, District Judge. The plaintiff, a Connecticut corporation, seeks by this petition to recover the sum of $54,277.07, income and excess profits taxes for 1918, or such amount as the court shall determine to be the reasonable deduction for the amortization of the cost of its acquired war facilities. During the war and subsequently, its manufacturing plant and principal place of business was in Voluntown, Conn. In 1918 the plaintiff was manufacturing cotton yarn, cotton cloth, tire fabric, and tent duck, and a substantial part of its product contributed to the prosecution of the war with Germany.

During the period beginning April 6,

I find that these items were acquired by the plaintiff, and that their cost was as set out in the schedule. Two questions remain for decision. First, did these items constitute facilities acquired for the production of articles contributing to the prosecution of the war? and, second, if they, or any of them, did, then what is the reasonable deduction that should be made for the amortization of the cost of such facilities?

The statute under which the deductions are claimed reads as follows:

"In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, *for the production of articles*

*contributing to the· prosecution of the present war,* and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous acts of Congress as a deduction in computing net income. *At any time within three years after the termination of the present war* the Commissioner may, and at the request of the taxpayer shall, reexamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the taxes imposed by this title and by title III for the year or years affected shall be redetermined and the amount of tax due upon such redetermination, if any, shall be paid upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 252." (Underscoring added.)

This text bristles with exegetical difficulties. It will, however, serve no useful purpose to discuss any of them, other than those directly involved in the case at bar.

 The scope of the statute, as I read it, almost defies limitation. "In the case of buildings, machinery, equipment, or other facilities," reads the statute. What is a "facility"? Judge Grubb, in the case of Corona Coal Co. v. United States (D. C.) 21 F.(2d) 489, defined "facility" as a "convenient means." But is this broad enough to cover the intent of Congress? He declined to apply the doctrine of ejusdem generis to the interpretation of the text and he gave very cogent reasons for his refusal. His decision was sustained by the Circuit Court of Appeals in 23 F.(2d) 673.

As any tangible thing may conceivably be a "convenient means" for some further end, it would seem that no instrumentality "for ·the production of articles" is excluded from the operation of the statute. The only question in any specific case is: Can the instrumentality for which amortization is claimed reasonably be said to stand in a causal relation to the production of articles contributing to the prosecution of the war? In the absence of any precedent in the Second Circuit I follow the judgment of the Circuit Court of Appeals for the Fifth Circuit, and so decline to apply the rule of ejusdem generis to the construction of the text.

However, it is not all instrumentalities of production that are here included. These "facilities" must have been erected or acquired for the production of articles "contributing to the prosecution of the present war." The purpose of the acquisition dominates the disposition to be made of the matter. ·A facility acquired for the purpose of such production may·be made the basis of a claim for amortization, even though that purpose was frustrated by the cessation of the· war. But· here a word of caution is necessary. The purpose need not have been patriotic, but it must have had a conscious relation to war aims. The purpose must have been merely to produce the requisite articles. If these "articles" contributed to the prosecution of the war then the conditions of the statute were fulfilled, even though the manufacturer of the "articles" had no intention of applying them to distinctly war uses.

What sort of "articles" were those that contributed to the prosecution of the war? Modern wars, more and more, engage the sum total of national resources in men and material, and in the World War there were very few "articles" indeed which could not in some way and in some measure have been classed as things "contributing to the prosecution of the present war." In the Corona Case, supra, the "article" involved was coal, and the "facilities" mine openings, shafts, slopes, tipples, etc. The "article" need not have been allocated to official uses. It need not have been manufactured directly or indirectly upon governmental commitments.

Voluntown, in which the petitioner's plant was located, is a small and isolated Connecticut village, seven miles at least from the nearest railroad station, which is Jewett City. The village boasted of no industry, save that of the petitioner's mills. These comprised four factory buildings, and in 1917 housed some 23,000 spindles. There were some dams, with water power plants and storage reservoirs, used in the operation of the mills, and the plaintiff also owned the tenement houses which sheltered its employees. At the time when war was declared, the plaintiff's business was principally the manufacture of cotton thread. During the war it manufactured cloth used in making linings for uniforms, as well as gas masks. It also manufactured duck for tents, wagon covers, and radio equipment. The tent duck was produced directly upon government contracts. Tire fabric was also produced, which went to the manufacturers of automobile tires.

I conclude, therefore, that the "articles"

produced by the plaintiff were such as "contributed to the prosecution of the present war." I also conclude that the items enumerated supra were "facilities" for "the production of the articles contributing to the prosecution of the present war." Item No. 10 is tenement houses acquired in order to house additional help, and while it is probably true that the help occupying the tenements paid rent, nevertheless I am inclined to regard this item as coming within the broad reach of the statute, and so find. Item No. 16 is for an icehouse. The evidence shows that the party who had theretofore supplied the help with ice went out of business. The plaintiff could not hold its help unless it furnished ice; and so I allow this item. Item No. 19 involved the acquisition of a furnace for the head weaver's house. The head weaver received wages, together with the right to occupy this house rent free. The use of this house was part of his compensation, and the house had to be heated; and so I allow this item.

■ In making these allowances I have thus far merely determined that the character of each of the 21 items stamps them as "facilities." I have also determined that the nature of the "articles" produced by the plaintiff was such as contributed to the prosecution of the war. But the date of the acquisition of a "facility" is another element which must be considered. Coal, for example, was produced in 1910 and 1918, and while coal is a material very necessary for war purposes, it could not be claimed, even, that coal mined in 1928 was an article contributing to the prosecution of the war. Obviously the date of acquisition of a facility is important.

In a previous memorandum of decision it was suggested that in the case of five items of "facilities" a dispute existed as to this point. It was then decided that the date when the plaintiff was committed to the acquisition of the facility should control, and that, if the plaintiff was committed prior to the Armistice the acquisition would be regarded as within the statute, provided that its installation was completed before the official close of the war, but that an acquisition which was contracted for after the Armistice would be regarded with suspicion. It was therefore ordered that the situation be clarified as to these disputed items, and the case was reopened, in order to give plaintiff an opportunity to prove the date when its commitments were made.

These five items are those enumerated as Nos. 11, 16, 18, 20, and 21. As to item No. 11, Mr. Briggs testified that he ordered the work done in the middle of September, 1918. He ordered one McWilliams to come over to the factory to finish a number of jobs before winter. The witness was then asked: "And at the time of the Armistice how far had the garage progressed?" That question seems never to have been answered. A colloquy followed, concerning a memorandum which the witness claimed was a refresher of his memory. The use of this memorandum was strongly objected to by counsel for defendant on the ground that it was not prepared by the witness.

■ A witness who testifies that the contents of a memorandum refresh his memory as to an event or series of events may use the same, even though it was not prepared by himself. The fact that he did not prepare it is merely one of the evidentiary facts, which go to the weight or credibility of his testimony. The witness had before him what he believed were transcripts of the daybook of the contractor from whom he ordered the work done. It is true that these transcripts were not in any legal sense verified as such. It may be that they were not accurate. It may be that they were not transcripts of the contractors' books, but were transcripts of the books of some other party. It may be that they were manufactured out of whole cloth and palmed off on the witness as true transcripts. But the fact is that the witness testified that these memoranda refreshed his recollection. There is no doubt that the events themselves took place. There is no doubt that the garage was built. There is no doubt that the plaintiff's own book entry made its cost a debit against the plaintiff on November 22, 1918. There is nothing unreasonable in the declaration that these memoranda refreshed his recollection, and that his recollection was that the garage was ordered in the middle of September, 1918.

Item No. 16 was the icehouse. I find that it was acquired in January, 1918, and completed in February, 1918. Item No. 18 concerns improvements on dam No. 3. I find that these improvements were ordered on September 1, 1918, and were finished on December 1, 1918. I further find that item No. 20 was ordered in May, 1918, and finished on September 27, 1918, and that item No. 21 was ordered on August 29, 1918, and that the water tank was received on the grounds of the plaintiff prior to November 8, 1918. I therefore find that all of the "facilities" were acquired for the production of articles contributing to the prosecution of the war.

It remains, now, to determine the reasonable deduction for the amortization of the

cost of these facilities. If the range of matters comprehended within the category of facilities and of articles contributing to the prosecution of the war is vast, so also is the field of speculation opened up by the phrase, which we find in the statute, that there shall be allowed "a reasonable deduction for the amortization of such part of the cost of such facilities as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title as a deduction in computing net income."

The statute indicates no criteria by which we are to determine the reasonableness of any claimed deduction, and the chief controversy between the parties concerns the intendment of this phrase. Indeed, counsel agree that the amount of the amortization is to be found by taking the cost of the facility and deducting therefrom what they call the post-war residual value. From this deduction there is to be eliminated any other amount previously claimed and allowed as a deduction, such as for depreciation or depletion.

How is this so-called post-war residual value to be determined? The Treasury Department promulgated the following rules:

"(1) In the case of property which has been sold or permanently discarded, or which will be sold or permanently discarded before March 3, 1924, the value shall be the actual sale price or estimated fair market value as of the date when the property was or will be permanently discarded (plus a reasonable allowance for depreciation in case the property is used in the taxpayer's business after the close of the amortization period. Such fair market value shall be established by investigation of engineers of the Bureau of Internal Revenue, if such investigation is deemed advisable)."

"(2) *In the case of property not included in (1) above, the value shall be the estimated value to the taxpayer in terms of its actual use or employment in his going business,* such value to be not less than the sale or salvage value of the property and not greater than the estimated cost of replacement under normal post-war conditions less depreciation and depletion." (Underscoring added.).

Article 184, Regulations 62.

We may defer for the moment consideration of the question as to whether these rules are reasonable. Without further elaboration, they impress me as inutile. They furnish no criteria for estimating "the value of the taxpayer in terms of the actual use or employment of his going business" of the facility the cost of which is being amortized.

For the purpose of calculating this estimated value to the taxpayer, the government now furnishes what it regards as a reasonable *modus operandi.* It would take the average number of labor hours during the war period and the average labor hours during the post-war period, and, on the basis of the proportion thus established, determine the value of the facility to the taxpayer; or it would measure the quantum of production during the war period against the quantum of production during the post-war period, and establish a proportion of valuation in this manner. Or, as in the case at bar, it would integrate these equations and determine the value accordingly.

I am constrained to regard this method as fallacious. The values of no other plant, machinery, or equipment are thus determined or determinable. The methods of evaluating depletion, depreciation, or obsolescence, all of which should furnish analogies, employ no such formula. I regard the method as out of relation to the practical facts. Suppose, for instance, that a factory had built an additional wing, which, however, became part of the whole factory building, and that in the post-war period this wing constituted so much waste space. On what basis should this wing be said to participate, and in equal measure, in the operations going on in the main building? Or suppose storage facilities in connection with the factory were enlarged, and became facilities which were no longer necessary in the post-war period. Or suppose additional washroom accommodations were installed, accommodations which the marked decrease in personnel rendered wholly unnecessary. What is the logic by which labor hour ratio could be made to correlate with this situation?

The court finds itself under the duty of determining its own criteria of evaluation. The situation is perhaps not more difficult than that involved in finding the monetary equivalent of physical pain or outraged good name. If our methods furnish but a rough approximation, perhaps the nature of the problem permits of no better solution.

Our first inquiry is: How does the concept of residual value stand in relation to that of amortization? The statute makes no mention of "residual value." It speaks of a "reasonable deduction" for the amortization of the cost. But it is also to be observed that it does not speak unqualifiedly of amortization. Obviously it is not the whole cost that is to be amortized. The amount of the amortization must be "reasonable."

Now, amortization is a wasting of the value; not of the res, but of the owner's ben-

eficial or economic interest in the res. It is a wasting through the mere operation of time. Amortization may go on simultaneously with an appreciation of the value of the res itself. The investment in a lease for a term of years, which investment includes, not only the purchase price of the lease, but the cost of all nonremovable fixtures placed on the land by the tenant, will evaporate as the term proceeds, even though the value of the land and the replacement value of the fixtures has risen. When the Commissioner of Internal Revenue speaks of the post-war residual value, he is referring to the value inherent in the res itself; but, when we speak of amortization, we are thinking of the dying out of somebody's investment in that thing. The two will admit of no relation, for they have no common denominator. Nevertheless the statute does have an ascertainable intendment which it is the duty of the court to expound.

■■■■ Facilities may be detachable things that can be put back into the channels of commerce, or they may be things which are not detachable and therefore incapable of re-entry into commerce. Things which are theoretically detachable may, nevertheless, be practically nonseverable, either because of the prohibitive cost of effecting severance and re-entry into commerce, or because when severed the value is destroyed. As to detachable facilities capable of being returned to the field of commerce, the residual value should be determined in one of two ways: First, where the taxpayer has made a bona fide sale thereof during the post-war period, the sale price thus realized, plus the value of its depreciation from the date of its purchase should constitute the residual value, and the amount of the amortization will be determined by deducting this sum from the cost; and, second, where the taxpayer has made no bona fide sale of the facility during the post-war period, then the residual value will be the market value at the end of the post-war period plus the value of the depreciation from the date of acquisition.

■■■ As to nondetachable facilities—that is to say, facilities that may not be put back into the channels of commerce—the residual value is prima facie nothing. In such cases the amount of the amortization is prima facie the cost of the facility.

■■■ In the Corona Case, supra, apparently the whole of the cost of making the mine openings and shafts was allowed. It is, indeed, true that, where such an actual investment continues to function usefully, a value of some kind inheres in it; but that value is so wholly speculative, in the absence of defin-

itive criteria, as to be legally inadmeasurable. What, for instance, are we to do with the electric light wiring, which cost over $1,100? We are not dealing here with a question of depreciation. We are to amortize the cost of something which may be just as good at the end of the post-war period as when it was installed. I think the plaintiff makes out its prima facie case by showing the cost of such a facility, and, while the ultimate burden of proof is on it, the burden of going forward, once that prima facie case has been made, is on the government.

In the case at bar we have been furnished with no evidence upon which to minimize the amortization. The government, conceiving that the burden of proof which rested on the plaintiff relieved it of any duty of going forward with any evidence, produced none other than such as would sustain its position if its theory of labor hour or production quantum ratios were adopted. On the other hand, the plaintiff does not contend for a zero value for its nonseverable facilities. Its position is more favorable to the government than the result of a rigorous application of the foregoing conclusions.

■■■ The testimony of the president of the plaintiff company shows that the value of all of the nonseverable facilities constituted 2.85 per cent. of the value of the whole plant. This percentage was not calculated personally by the witness. It was the percentage exhibited on an inventory and appraisal of the plant made by Lockwood, Greene & Co., accountants, of Boston. The inventory itself was not admissible; by no pretense could it be said to have refreshed any independent recollection of the witness, and his repetition of the figures shown on the appraisal sheet was incompetent as evidence. The point, nevertheless, is that, in view of the mechanics of such a trial, the duty of introducing evidence minimizing the prima facie cost rested on the government. The witness then testified that the maximum value of the whole plant during the post-war period was $128,500. By taking 2.85 per cent. of this figure, $3,662.25 is found as the residual value of these facilities.

The method here disclosed is dubious enough, although it seems to come closer to the real solution than the labor hour ratio theory of the defendant. It rests upon the assumption that it is possible to find the exact proportion that the value of any part of a structure bears to the whole. This possibility may well be disputed, but, as it is the only minimizing evidence in the record, it will be adopted for the purposes of this case.

In determining, nevertheless, the base up-

on which this percentage should be calculated, the court is not restricted to the opinion evidence given by Mr. Briggs at trial. The declarations of value made by this witness under oath on July 20, 1923, embodied in the 1924 capital stock tax return—a statement verified also by the plaintiff's treasurer—are to my mind of higher probative value. I am not unmindful of the testimony of the expert, Mr. Mason; but I regard contemporaneous and unexplained admissions against interest much more cogent than opinion evidence on historical values. The residual value of these facilities will therefore be calculated on the base of $305,959.75. I also find that the plaintiff did not engage in producing articles for the prosecution of the war after 1918.

The residual values of the severable facilities set forth in the first six items are found to be as follows:

| | |
|---|---|
| Item 1 | $12.00 |
| Item 2 | 30.00 |
| Item 3 | 30.00 |
| Item 4 | 31.25 |
| Item 5 | 8.00 |
| Item 6 | 10.00 |

The residual value of the balance of all other items which constitute the nonseverable facilities is $8,719.85. The total residual value, therefore, is found to be $8,841.10, which sum is to be deducted from the total cost of $33,128.51, leaving a tentative amortization of $24,287.41. From this sum there will be deducted depreciation of all of its items previously claimed and allowed, and all previous allowances for amortization.

It was agreed that, after the court had found the post-war value, counsel would get together and do all of the arithmetic and accounting necessary to transmute findings of value into "reasonable deductions," and thence onward into the actual effect upon the income tax return. Therefore there may be judgment for plaintiff in accordance with the findings herein made, and after counsel have concluded their arithmetic they may submit judgment accordingly.